IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Civil Action No. _____

INSTITUTO MEXICANO DEL SEGURO SOCIAL,

    *Plaintiff*,

v.

OLYMPUS LATIN AMERICA, INC.,

    *Defendant*.

## IMSS' ORIGINAL COMPLAINT

The Instituto Mexicano del Seguro Social ("IMSS") sues Olympus Latin America, Inc. ("Olympus") as follows:

### NATURE OF THE CASE

1. For years, Olympus used bribery as an integral part of its world-wide marketing strategy.

2. Olympus' illegal conduct is well established. In March 2016, Olympus and its affiliate, Olympus Corporation of the Americas, resolved parallel actions by the Department of Justice, by which they confessed to organized bribery in Mexico, the United States, Brazil, Bolivia, Chile, Colombia, Argentina, Mexico, and Costa Rica. Per the two agreements, Olympus paid a total of more than $634 million in fines, penalties and disgorgements.

3. In Mexico, Olympus paid bribes to officials at IMSS, the Mexican governmental agency that provides medical care to the majority of Mexican citizens. Olympus organized the bribery scheme out of its Miami headquarters.

## JURISDICTION AND VENUE

4. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 (a)(4) because this action is between a foreign state pursuant to the Foreign Sovereign Immunities Act (the FSIA) and a citizen of the United States.

5. This Court has venue pursuant to (1) 28 U.S.C. § 1391(b)(1) because Olympus has its principal place of business in this District and (2) 28 U.S.C. § 1391(2) because a substantial part of the events and omissions giving rise to the claims presented herein occurred in this District.

## PARTIES

6. IMSS is the Mexican Social Security Institute, a decentralized agency of the United Mexican States. IMSS is therefore a "foreign state" pursuant to the FSIA, and its officials are covered by the Foreign Corrupt Practices Act.

7. Olympus is a Delaware corporation headquartered in Miami. Its ultimate parent is headquartered in Japan.

8. Olympus can be served with process by service on its registered agent, Corporate Service Company, 1201 Hays Street, Tallahassee, Florida 32301-2525.

## FACTUAL BACKGROUND

*The Parties*

9. IMSS is the main social-service agency of the Mexican government. IMSS was created in 1943 by order of the Mexican President, who continues to nominate IMSS' General Director.

IMSS' ORIGINAL COMPLAINT—page 2

10. IMSS provides health care services to tens of millions of Mexican citizens at hospitals that IMSS owns and operates throughout Mexico. The Mexican government funds IMSS through taxation and compulsory contributions. IMSS also manages the purchases of medical supplies for other Mexican governmental agencies, including the Instituto de Seguridad y Servicios Sociales de los Trabajadores del Estado (ISSSTE), Petroleos Mexicanos (Pemex), and the Mexican military.

11. IMSS is the appropriate agency to bring the claims presented herein.

12. Olympus is a Delaware corporation headquartered in Miami that distributes Olympus medical imaging equipment in Latin America and the Caribbean.

*Olympus' International Bribery Scheme*

13. For years, Olympus used bribes to sell its products to governmental agents throughout the Americas, including within the United States and Mexico.

14. Olympus' international bribery strategy has been established in actions brought by the United States Department of Justice.

15. As a result of the criminal actions brought against it, Olympus cannot deny its responsibility under United States law for its international conduct. Per Olympus' deferred prosecution agreement with the DOJ, Olympus "admits, accepts, and acknowledges that it is responsible under United States law for the acts of its former officers, directors, employees, and agents as charged" and that the factual charges against it were and are true. Olympus also agreed that it would not "make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility" for its international bribery scheme.

16. Olympus confessed to paying illegal bribes in Mexico, Brazil, Bolivia, Chile, Colombia, Argentina, Mexico, and Costa Rica. Olympus paid the United States government $22.8 million in fines and forfeitures for the confessed conduct.

IMSS' ORIGINAL COMPLAINT—page 3

17. Mexico and IMSS received none of those funds.

18. At the same time, Olympus Corporation of the Americas, which controls Olympus, entered into a similar deferred prosecution agreement by which it confessed to using the same kinds of illegal kickbacks within the United States. To resolve the criminal action and a related civil action brought by the United States government, Olympus Corporation paid the United States government more than $612 million.

*Olympus' Illegal Conduct*

19. Beginning in 2006, Olympus' senior management designed and implemented a plan to increase medical equipment sales in Latin America by bribing doctors and other health care providers who could influence purchasing decisions at hospitals. Many of these health care providers, especially within Mexico, were government officials. Olympus provided those government officials with cash, money transfers, travel, free or heavily discounted equipment for use in their private (as opposed to public) practices, and other things of value.

20. Olympus' primary bribery technique was to open "training centers" that provided excessive benefits to targeted health care providers who could direct purchasing decisions of government hospitals. Although the training centers were ostensibly opened to educate and promote minimally invasive procedures using Olympus equipment, the primary purpose of the centers was actually to provide pecuniary benefits to targeted government officials employed by public institutions or who sat on public tender boards.

21. One way Olympus used its training centers to pay bribes was simply by hiring key decision-makers to run the centers. First, senior management at Olympus identified influential health care providers, who Olympus called "Key Opinion Leaders." These Key Opinion Leaders were then

targeted for bribes. Olympus management repeatedly encouraged its employees to identify Key Opinion Leaders based on the future expected sales that they could influence.

22. In early 2007, Olympus management in Miami established a plan to pay its identified Key Opinion Leaders a salary of $65,000 a year to run Olympus' "training centers," plus a $130,000 budget for what was termed "VIP Management." The Key Opinion Leaders were also given a 50% discount on Olympus equipment for their personal practices, but not of course for their government employers.

23. From early 2007 through mid-2010, Olympus opened thirteen training centers, including seven connected to state-owned hospitals in Latin America. An Olympus employee in Miami was tasked with determining the effectiveness of the bribery scheme by tracking Olympus equipment sales attributable to each training center and Key Opinion Leader being compensated through the program.

24. In 2008, Olympus also established a "Miles Program" to provide free travel to Key Opinion Leaders for personal reasons. Under the program, one "mile" was equivalent to one U.S. dollar that could be used for personal or non-Olympus medical education travel expenses. Olympus offered certain Key Opinion Leaders who operated training centers between 5,000 and 30,000 miles (that is, $5,000 and $30,000) in compensation under the Miles Program. Olympus did not require any pre-approval of the travel and did not establish or use any review process for submitted expenses that were to be redeemed under the Miles Program.

25. Senior management at Olympus took active steps to hide the improper payments from relevant governmental and hospital authorities, such as IMSS. Olympus omitted any reference to payments, gifts, donations, and personal equipment discounts from relevant contract language. Olympus also entered into confidential side agreements with health care providers. For example, in

2010, an Olympus employee in Miami sent an email to a distributor in Honduras about an upcoming donation to influence a public tender, writing (as translated): "The document should make no allusion (mention, comment, etc.) to the fact that the donation to be made, will favor or promote new business with Olympus or with [the distributor]. The donation should not be interpreted as an action which conditions business later…. This is extremely important. I'll explain in detail later."

26. In another example, in February 2010, an Olympus employee in Miami sent an email concerning a contract with a physician, stating (as translated): "Dear all, I am re-sending the Agreement, eliminating clauses 3.1 and 3.4, and I also eliminated the one about the Olympus miles. As we said, we are going to offer them but we are not going to put it in writing."

27. Olympus management explicitly linked improper payments to Olympus' receipt of business directed by the bribed officials. For example, in early 2007, an Olympus employee in Miami emailed a distributor, writing (as translated): "But it is important for [the health care provider] to understand that what we are doing is not because we are nuns from Mother Teresa's order in Calcutta. Rather, we expect reciprocity on his part…."

28. Olympus management ensured that they received the benefits they believe they had purchased through their bribes. For example, in late 2010, multiple Olympus employees in Miami and an Olympus distributor discussed pressuring a health care provider who had failed to generate purchases despite being bribed, writing (as translated): "I would be grateful if, during your visit to [Chile] you could remind [the health care provider] that two years ago [the distributor] bought a trip to Europe for his sister and HE DIDN'T BUY THE OLYMPUS EQUIPMENT AS AGREED."

29. Olympus senior management actively tracked the "return on investment" on their bribes to Key Opinion Leaders, using a shared spreadsheet.

30.     In total, from 2006 to 2011, alone, Olympus directly or indirectly paid about $3 million in bribes in Latin America to influence the purchasing decisions of large hospital groups. Olympus concedes that it garnered large profits from the illegal scheme.

31.     As set out below, the damages were to IMSS and Olympus' other victims was far greater than Olympus' gains.

*Olympus Activity in Mexico*

32.     IMMS operates the largest healthcare system in Mexico and also conducts the purchase of medical supplies for other governmental agencies. The IMMS officials who make purchasing decisions for IMSS and other governmental agencies are government officials.

33.     For years, Olympus bribed IMSS officials to sell its products.

34.     In particular, in 2008, Olympus actively manipulated an IMSS tender for the purchase of endoscopy equipment and medical accessories. Before the tender was made public, the president of an Olympus distributor traveled from Mexico City to Miami to meet with Olympus. During the meeting, Olympus was informed that IMSS officials had changed the specifications for the tender to favor Olympus equipment and to prevent Olympus's primary competitor from qualifying for the tender.

35.     No one at Olympus wanted to know how its distributor had achieved the beneficial changes in the tender. Olympus simply continued to support the distributor's efforts to manipulate the tender specifications.

36.     In May 2008, an Olympus employee in Miami sent an email stating that Olympus had "strategically" reduced the number of endoscopy towers that would be requested by the government under the tender because doing so would have the effect of leaving a key Olympus competitor "totally out" of the running for winning the tender.

IMSS' ORIGINAL COMPLAINT—page 7

37. In June, an Olympus distributor and Olympus formed a new joint-venture company ("Mexico JV") to bid on the tender. Under the terms of the joint venture, Olympus and the distributor would split the profits received as a result of the tender. The Mexico JV presented its bid that same month.

38. In August 2008, Olympus employees traveled from Miami to Mexico City to address ongoing problems with the contract and to discuss ways to increase revenues from the procedures being performed.

39. Following the meeting in Mexico, an Olympus employee prepared a report indicating that Mexico JV would begin meeting on a monthly basis with a senior government official in Mexico to address the contract issues. In mid-August, one week after the joint meeting with Olympus, the Mexico JV, on behalf of Olympus, signed a service agreement with a Mexican agent by which the agent would be paid on a monthly basis to "streamline … administrative processes" and perform various services that were not called for or needed under the tender. Further, in connection with the agreement with Mexico Agent, Olympus agreed to reduce the revenues it would receive under the IMSS contract despite receiving no actual services from the Mexico Agent.

40. From December 2008 through December 2010, Mexico JV, on behalf of Olympus, made and falsely recorded payments to the Mexico Agent as being for "administrative and advisory services for public bids" and for other services, none of which were actually rendered. Olympus knew or was willfully ignorant of the fact that the payments would be used, in part, to pay bribes to government officials.

41. The purpose of the payments was to improperly influence IMSS officials.

*Effect on IMSS*

42. To obtain IMSS contracts, Olympus (indeed any seller to IMSS) had to represent that it was complying with all legal requirements for the sale of medical equipment to IMSS and within Mexico.

43. Olympus made the required representations, but its statements were manifestly false.

44. IMSS relied on Olympus' false, material statements and omissions in order to consummate business transactions with Olympus.

45. IMSS' reliance lasted longer than the bribes themselves. With each additional contract, Olympus had to represent that it had and would comply with Mexican law. Following the first bribes, those representations were false. Absent the false representations, IMSS would have been legally barred from contracting with Olympus. Therefore, IMSS relied on Olympus' representations when approving contracts for the purchase of Olympus products well after the expressly illicit conduct set out above.

46. Olympus' fraud voids its contracts with IMSS, and therefore, Olympus should be required to return all proceeds received from IMSS, retaining *at most* the actual production cost of the equipment it sold.

## CLAIM FOR RELIEF—FRAUD

47. Based on the foregoing facts, IMSS raises a claim for fraud.

48. Olympus' false, material statements and omissions above to IMSS were fraudulent.

49. IMSS relied on Olympus' false, material statements and omissions in order to consummate business transactions with Olympus. Absent the false claims, IMSS would have been barred from contracting with Olympus.

50. As a result of the above fraud, IMSS has been damaged.

51.     IMSS is entitled to avoid the contracts fraudulently obtained and to a return of the compensation it paid to Olympus or other damages as determined by law. IMSS' remedies are the same under either United States or Mexican law.

## PRAYER FOR RELIEF

52.     IMSS prays that this Court award it all the relief to which it is entitled under law or equity.IMSS demands a jury trial for all matters so triable.

Dated: November 5, 2020

>                                   Respectfully submitted,
>
>                                   By: /s/ Matthew J. Valcourt
>                                   Matthew J. Valcourt
>                                   Fla. Bar No. 0088791
>                                   VALCOURT AND ASSOCIATES LLC
>                                   850 NE Third St Suite 208
>                                   Dania FL 33004
>                                   Telephone: (305) 763-2891
>                                   Facsimile: (305) 470-7484
>                                   Email:mvalcourt@valcourtlaw.com
>
>                                   ATTORNEYS FOR IMSS